**STATE of Missouri, Respondent,**

v.

**Eugene Ray KOLLENBORN, Appellant.**

No. 43549.

Supreme Court of Missouri,
En Banc.

Sept. 9, 1957.

Max Patten, Joplin, for appellant. ·

John M. Dalton, Atty. Gen., Fred L. Howard, Asst. Atty. Gen., for respondent.

EAGER, Judge.

This case is written on re-assignment. Defendant was tried, convicted, and sentenced to a term of 6 months in jail for acts constituting a violation of § 559.-340. (All statutory references are to RS Mo 1949, V.A.M.S., unless otherwise stated.) That section deals with the mistreatment of an infant under the age of 16 by a parent or other person having the care and control thereof; the punishment ranges from 3 years in the penitentiary down to a fine; the offense is a felony of which this court has jurisdiction. Section 556.020; State v. Garner, 360 Mo. 50, 226 S.W.2d 604, 606.

The case was tried by agreement before the Honorable Rex V. McPherson as Special Judge, without a jury. Under Art. I, § 22(a), Constitution of Missouri, 1945, V.A.M.S., a jury may be waived in any criminal case with the consent of the court, and the court's finding shall have the force and effect of a verdict of a jury.

Defendant was the father of the infant in question; he was 22 years of age at the time of the alleged offense in November, 1951, and his wife was either 18 or 19. He had married Betty Kollenborn (whose maiden name is not shown) on January 12, 1949. Their progress in the matrimonial venture had not been unperturbed; she did not know where her husband was living at the time the child was born on July 4, 1951, and she had gone to Wichita, Kansas. Thereafter they were reunited and lived in Joplin, Wichita and Carthage. They were living in Carthage in November, 1951, in an upstairs apartment. At that time the infant daughter was between 4 and 5 months old. The wife worked "most of the time." The oral evidence showed: that around the first of November (1951) the baby's ankle was swollen, and the mother took her to a doctor who found nothing wrong; about 2 weeks later defendant went to a show one evening while his wife stayed at home with the baby; after his return and during the very late evening or early morning, the baby was "fussing" in her bed and the husband got up; the baby started "screaming" and the mother got up, took her, and rocked her to sleep. The mother was awakened by the screaming, and when she got up, defendant was bent over the bed and the baby was crying. The next morning the baby's "whole body" was swollen, and the mother took her first to a doctor in Carthage and then both parents took her to the K. U. Medical Center in Kansas City. There she stayed for a week; she was X-rayed, and her arm was put in an elastic bandage. The child's left arm is "crooked" just a little above the elbow; the mother learned at Kansas City that the child had an "injured" arm and ankle. About 3 weeks after these occurrences the wife left defendant, and on February 29, 1952 (prior to the trial), procured a divorce. The foregoing recital comprises the substance of the testimony of Betty Kollenborn, defendant's former wife. When she was called as a witness for the State, she stated

under oath that she desired to testify voluntarily, and to tell what she knew about the case; also, that she knew that she might refuse to testify, and that she was not being compelled to testify. It was agreed between counsel that Dr. Isbell, of Carthage, would testify that the child was "injured" when brought to him and that he recommended that it be taken to Kansas City. Lillian Briggle, who lived downstairs in the same apartment building, testified that on one Sunday "night" in November, 1951, about 1 or 2 A.M., she heard the baby upstairs crying, and heard such loud voices that she went out in the hall to listen. On the next morning Mrs. Kollenborn brought the baby to the witness' apartment and called the doctor from there; the baby's ankles were swollen, its arm, "this arm," was "laying like this," and when the witness slipped her finger under its arm "on the bed," it screamed. She knew of no one else in the Kollenborn apartment that night except the husband, the wife, and the baby.

After complaint was made and defendant was arrested, he made and signed a detailed statement in the presence of a deputy sheriff, the City Marshal, and the jailer. This was offered and received in evidence at the trial without objection. Therein defendant stated, in part: that he and his wife were separated for almost a year; that he had a violent temper; that his wife had threatened to leave him for spanking the baby "too hard," as she thought; that on one occasion in November, 1951, while his wife was working, the baby was fussing and he "jerked it up out of bed," and its feet were caught in the railings of the bed; that "it could have been a possibility that I injured its leg"; that on November 25, 1951, although his wife asked him not to go, he and his brother-in-law went to a show; he got home about 10:30 or 11 P.M.; he and his wife "had a few words," and she was already in bed; "sometime in the night, the baby was fussing," and he got up and went to the crib; that he reached down and took hold of the baby's

left arm (and possibly her leg), jerked her "clean up out of the crib and shook her pretty rough"; that she "let out a loud cry, as if though in pain"; that at that point his wife got up and took the baby; that, on the next morning, his wife sent word to him at work that the doctor said there was something seriously wrong with the baby and that it needed to be taken to a baby specialist, so he borrowed a car and took them to Kansas City; that the doctor in Kansas City told him, as he understood, that the baby had two broken ankles and that its arm was out of place. At the trial the defendant merely testified that he did not break the baby's arm or leg, and he produced several character witnesses.

On this evidence the trial judge, sitting as a jury, found defendant guilty and fixed his punishment at imprisonment for 6 months in jail, stating expressly that, in so doing, he had considered the time already spent in jail. Motion for new trial was filed and overruled, allocution awarded, and sentence pronounced accordingly; this appeal was duly taken.

■ No brief has been filed here for appellant. We, therefore, examine those assignments sufficiently raised in his motion for a new trial. State v. Murray, Mo., 280 S.W.2d 809. These are, somewhat consolidated and condensed: (a) that the court erred in permitting defendant's former wife to testify to "occurrences during the period of their marriage," such being privileged; (b) that the State's proof failed to show that defendant had committed the crime alleged; and (c) that, even if defendant's statement was a "confession," there was no proof of the corpus delicti. We shall consider these points in inverse order.

■ It would be a mere quibble on words to discuss whether defendant's written statement was a "confession" or not; it was an extra-judicial admission against interest, received in evidence without ob-

jection, and it was thus in the case for whatever it might legally prove. "Corpus delicti" (i.e., proof of the "body of the offense," City of St. Louis v. Gavin, Mo. App., 222 S.W.2d 531) has been described as consisting of, and requiring proof of, two elements, namely: proof of the death (or injury) of the person in question; and proof of the criminal agency of someone in causing it. State v. Lyle, 353 Mo. 386, 182 S.W.2d 530. Apparently, defendant here claims that there must be independent proof of every element of the crime, aside from his own statement. In the Lyle case, supra, in City of St. Louis v. Gavin, supra, and in State v. McQuinn, Mo., 235 S.W.2d 396, it has been held that full proof of the corpus delicti, independent of defendant's extra-judicial admissions or confessions, is not required; if there is independent evidence, direct or circumstantial, which is corroboratory of the admissions, then both or all may be considered together in determining whether the corpus delicti has been sufficiently proved. See also: State v. Black, 360 Mo. 261, 227 S.W.2d 1006 (abuse of a minor child, with a charge of manslaughter); State v. King, 342 Mo. 1067, 119 S.W.2d 322; 26 Am.Jur., Homicide, § 383, p. 425. In the case of City of St. Louis v. Gavin, supra, the court said, at 222 S.W.2d 531, loc. cit. 540: "In our state in the case of State v. Skibiski, 245 Mo. 459, loc. cit. 463, 150 S.W. 1038, [loc. cit.] 1039, the Supreme Court said, 'The rule in this state has long been that full proof of the corpus delicti, independently of the confession, is not required. If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved in a given case.' This rule has been stated in many cases, some of which are: State v. Mullinix, 301 Mo. 385, 257 S.W. 121; State v. McGuire, 327 Mo. 1176, 39 S.W.2d 523; State v. Kauffman, 329 Mo. 813, 46 S.W.2d

843, 848; State v. King, 342 Mo. 1067, 119 S.W.2d 322, 326; State v. Lyle, 353 Mo. 386, 182 S.W.2d 530, loc. cit. 533." The case of State v. Humphrey, 358 Mo. 904, 217 S.W.2d 551, cited by this defendant in the trial court, was overruled in State v. Hardy, Mo., 276 S.W.2d 90, in so far as it purported to define the elements necessary for proof of the corpus delicti. We have no hesitancy here in holding that the testimony of the wife and the neighbor constituted sufficient corroboration, and that all the evidence sufficiently proved the corpus delicti. We are not confronted here with any question on the admissibility of the confession, for trial counsel expressly stated that there was "no objection" to it.

From counsel's oral argument upon a motion for dismissal in the trial court, we gather that one of defendant's principal arguments on the insufficiency of the evidence was that defendant had merely admitted a *possibility* that he had injured the baby's ankle or leg; this evidently referred to the occasion concerning which defendant had stated that the baby's feet were caught in the railings of the bed. We may disregard that occasion entirely, and consider merely the subsequent occasion (on or about November 25, 1951) when he admits that he jerked the baby "clean up out of the crib and shook her pretty rough"; it was the latter occasion about which the wife testified, and the injury then sustained would be sufficient in itself for all present purposes. The information charged an offense committed on "or about the ———— day of November, 1951," and defendant has made no point of the indefiniteness in dates; we may thus consider the events which transpired on the second occasion as constituting the offense charged. We doubt that evidence of both offenses should be considered, for technically each offense was separate. We shall so consider the case; in this view, defendant's insistence on a mere "possibility" of injury is wholly immaterial.

■ The principal question, and the only troublesome question, involved here is the admissibility of the testimony of the former wife, Betty Kollenborn. Her testimony constituted the major part of that evidence which we have held to be corroboratory of defendant's admissions, and it was for that reason, an essential part of the State's proof. We shall dispose first of a specific objection to a question asking the wife for any conversations had with the defendant at the time; the objection that the matter would constitute privileged communications was overruled. The answer was that defendant had then said that he had merely picked the baby up to give her the bottle and that he had not hurt her. The question was improper and the objection should have been sustained; the last clause of § 546.260 forbids such testimony when one spouse is testifying for the other; the disqualification of such testimony in § 491.020 is perhaps limited to civil cases. But in any event a disqualification of such testimony has generally been adopted. State v. Kodat, 158 Mo. 125, 59 S.W. 73, 75, 51 L.R.A. 509; State v. Bell, 212 Mo. 111, 111 S.W. 24; Vol. 3, Wharton's Criminal Evidence (12th Ed.), § 767, p. 105; Vol. 8, Wigmore on Evidence (3rd Ed.), §§ 2228 and 2237, pp. 226, 249. Here, however, the "communications" received in evidence admitted nothing, directly or indirectly, and the evidence could not have been prejudicial in any event.

■ In the following discussion, we shall refer to criminal cases and procedure, unless otherwise stated. At common law one spouse was not permitted to testify for or against the other, generally, whether willing or unwilling to do so. State v. Willis, 119 Mo. 485, 24 S.W. 1008; State v. Arnold, 55 Mo. 89; State v. Evans, 138 Mo. 116, 39 S.W. 462; State v. Witherspoon, 231 Mo. 706, 133 S.W. 323. This disqualification was based upon: (a) the supposed public policy of promoting and preserving domestic harmony; (b) the strong "repugnance" against seeing a person convicted by the testimony of one

"sharing the secrets of his domestic life and living under his roof" (Vol. 8, Wigmore on Evidence, 3d Ed., § 2227, p. 222, § 2228, pp. 224, 225); and, (c) because of the temptations to perjury (State v. Willis, 119 Mo. 485, 488, 24 S.W. 1008). Reasons (a) and (b) were presumably applicable to prevent adverse testimony, while (c) might presumably apply in any event. But, we also see that centuries ago, and almost contemporaneously with the growth of the rule itself, an exception developed. This exception has been variously defined in the cases expounding it, but its substance was that a wife or husband would be, and was, permitted to testify against the other spouse where the latter had committed or attempted an assault or other act of violence upon the proffered witness; naturally, such testimony was admitted over the objection of, and without the consent of, the offending spouse. This doctrine was declared in Missouri prior to the enactment of any statutes on the general subject. For discussions thereof, see: State v. Koelzer, 348 Mo. 468, 154 S.W.2d 84; State v. Anderson, 252 Mo. 83, 158 S.W. 817; State v. Vaughan, 136 Mo.App. 645, 118 S.W. 1186; State v. Pennington, 124 Mo. 388, 27 S.W. 1106. The existence of the exception was recognized in Missouri in the very early case of State v. Newberry, 1869, 43 Mo. 429; and, incidentally, we note that in this early (and probably first) Missouri case the common law requirement of an assault or personal violence was extended to include the abandonment of the wife. The court noted there that the facts were known only to the husband and wife, that the offense could not be proved except by the wife's testimony, and that "the principle is broad enough, in our opinion, to include the case at bar." In discussing the reasons for the common law exception the court said, 43 Mo. loc. cit. 430: "To the general rule excluding the husband and wife as witnesses there are many exceptions, which are allowed from the necessity of the case—partly for the protection of the wife, and partly for the sake of pub-

lic justice. Sometimes this necessity is general, as where there is no other witness to the facts; sometimes particular, as where, for instance, the wife would otherwise be exposed, without remedy, to personal loss or injury. (1 Greenl. Ev. 343-344; 1 Phil. Ev. 94, 95; 2 Stark Ev. 403-404; 2 Bright on Husb. and Wife, 42, §§ 25, 26.) In this case the necessity was both general and particular. There was no other witness, and without her testimony she would be remediless and public justice defeated. This case, then, comes within the reason and philosophy of all the exceptions to the general rule." And see State v. Bean, 104 Mo.App. 255, 78 S.W. 640. Various other cases and authorities have emphasized the theory of "necessity" in enforcing the exception. State v. Anderson, 252 Mo. 83, 158 S.W. 817; State v. Vaughan, 136 Mo.App. 645, 118 S.W. 1186; 8 Wigmore, supra, § 2239, p. 251; Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, loc. cit. 283, 4 A.L.R.2d 826 (a civil case). Some of the rather nebulous definitions of "necessity" in certain of the Missouri cases cited (as in State v. Vaughan, 136 Mo.App. 645, 118 S.W. 1186) seem to have originated in an opinion of Lord Mansfield (1784) in the case of Bentley v. Cooke, 3 Doug. 422. To us the real necessity arises from the fact that, without the testimony of the wife, justice may not be done to the public in general, and also from the fact that the husband should not be permitted, at his option, to exempt himself from punishment by closing the mouth of the only witness against him. And, as Mr. Wigmore effectively argues, in such cases the reasons for the rule of exclusion itself have fallen, for no domestic harmony or peace may be presumed to exist after the husband has beaten, poisoned, or deserted his wife, and any peace which then remained would be enforced by tyranny. 8 Wigmore, supra, § 2239, pp. 251-252. And any public "repugnance," in such cases, would more properly be directed at a rule of law which excluded the testimony of the in--

jured wife, rather than at its admission. As already indicated, Mr. Wigmore felt that the entire rule of exclusion of a spouse's testimony was never sustainable, except as to confidential communications, and that it is not in the interest of public justice. We on the courts, however, may not so easily wipe out a doctrine that has been firmly implanted for four centuries or so.

Into this common law scene of exposition and confusion, rule and exception, came our first statute on the subject in 1879 (§ 1918, Ch. 24, RSMo 1879). It was then enacted, to all present intents and purposes, as it now remains in our § 546.260. For convenience, and in view of our subsequent discussion, we quote it here, as follows: "No person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial or examination, or by reason of being the husband or wife of the accused, but any such facts may be shown for the purpose of affecting the credibility of such witness; provided, that no person on trial or examination, nor wife or husband of such person, shall be required to testify, but any such person may, at the option of the defendant, testify in his behalf, or on behalf of a codefendant, and shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case; provided, that in no case shall husband or wife, when testifying under the provisions of this section for a defendant, be permitted to disclose confidential communications had or made between them in the relation of such husband and wife."

It will be noted that this statute makes no attempt to incorporate or define the common law exception permitting a spouse to testify in case of an assault or violence to him or her by the other spouse. In this respect the Missouri statute is exceptional. The statutes of the 48 states are collected in Vol. 3, Wigmore on Evidence, § 448, in an extensive note, with the additions and amendments in the pocket parts; the effect of these varies widely. Some, in effect, abolish generally the disqualification of one spouse to testify for or against the other; some provide that such spouse shall be competent, but shall not be required to testify; some provide that one may only testify with the consent of the other, or that he or she may not (generally) testify against the other; many expressly prohibit the disclosure of confidential communications. But the vast majority of these statutes contain some provision adopting and defining, and in some instances expanding, the common law exception discussed above; and these provisions vary considerably. The most common are that the wife (or either spouse) may testify against the husband (or other spouse) in the prosecution of such other "for a crime committed by one against the other," or "for an offense committed by or against the other," or in case of "personal injury of either by the other," or in cases involving "unlawful assault or violence * * * on such witness." At least 5 states (Ohio, Pennsylvania, Oregon, Virginia and West Virginia) have expressly expanded the exception by statute so as to permit testimony by the wife against the husband where he has committed an act of violence, personal injury, or cruelty (the phrasing varies) against a minor child (below a fixed age) of the couple, or of either of them. These states have thus, by statute, recognized that the same necessity exists for the testimony of the wife when her child is injured, as exists when she herself is wrongfully or criminally injured.

Our statute (§ 546.260) is primarily an enabling act, enacted to relieve against certain fixed, common law disabilities; it was not enacted for the purpose of creating new disabilities. Considered in this light, and since it contains no express provision eliminating the common law exception permitting the wife to testify against her husband in case of her own injury by the husband, we think that common law exception still exists. At least,

various Missouri cases decided since the enactment of the statute have seemed to have no difficulty in declaring and upholding the exception. State v. Koelzer, 1941, 348 Mo. 468, 154 S.W.2d 84; State v. Bean, 1904, 104 Mo.App. 255, 78 S.W. 640; State v. Anderson, 1913, 252 Mo. 83, 158 S.W. 817; State v. Pennington, 1894, 124 Mo. 388, 27 S.W. 1106. The law does not favor repeals of the common law by implication in a statute, and a legislative intent to do so is generally not presumed. State v. Dalton, 134 Mo.App. 517, 114 S.W. 1132; Raper v. Lusk, 192 Mo.App. 378, 181 S.W. 1032; Lajoie v. Central West Cas. Co., 228 Mo.App. 701, 71 S.W.2d 803. If it be urged that the express statutory permission for the wife to testify on behalf of her husband, "at the option of the defendant," excludes all forms of voluntary testimony against him, we merely say that our courts have not so interpreted the statute in cases where the wife has been assaulted or injured by him and volunteers to testify. See the cases last cited above. In the case of State v. Dunbar, 360 Mo. 788, 230 S.W.2d 845, Division One of this court held that it was reversible error to compel a wife to testify against her husband in a prosecution for felonious assault on the wife, although under the statute she was a competent witness; the court further held that the common law exception permitting the wife to testify, voluntarily, in the event of her criminal injury by the husband was not changed by our statute; and it further indicated (as we understand the opinion) that our statute (then § 4081, RSMo 1939) means: (1) that in no event may one spouse be *required* to testify against the other; but (2) that in any criminal case he or she *may* testify voluntarily against the other, if he or she so chooses. In so far as clause (2) is concerned, that question was not directly involved there on the facts, and we need not go so far here in our construction of the statute.

There are few reported cases involving the issue which we now have. Most of them did not specifically involve the common law exception, but rather a construction of statutes different from ours. However, in State v. Woodrow, 1905, 58 W.Va. 527, 52 S.E. 545, 2 L.R.A.,N.S., 862, the court held that under the common law a wife was not a competent witness against her husband in a prosecution for the murder of their infant child while in its mother's arms, although the defendant actually shot at the mother and wounded her with the same bullet. The decision was premised upon the theory that while the wife could testify in a prosecution for a criminal assault which, in a legal sense, was upon herself, she could not do so otherwise, and that the then West Virginia statute did not alter the common law rule. The decision, we think, is somewhat narrow and strained. There was a vigorous dissent by two judges to which we shall allude later. This precise situation has since been corrected in West Virginia by express statute. West Virginia Code, 1955, § 5728. See also to the same general effect as the Woodrow case, supra: Grier v. State, 1924, 158 Ga. 321, 123 S.E. 210, 35 A.L.R. 1122 (but under a statutory exception confined to criminal offenses committed or attempted upon the person of the wife; with a dissenting opinion); People v. Westbrook 1893, 94 Mich. 629, 54 N.W. 486 (a one-paragraph opinion, based upon the authority of a prior case to the effect that bigamy is not a "personal wrong or injury" to the wife under the Michigan statute [3 How.Ann.St.1883–1890, § 7546]; in the prior case—People v. Quanstrom, 93 Mich. 254, 53 N.W. 165, 17 L.R.A. 723, three judges dissented); Cargill v. State 1923, 25 Okl.Crim. 314, 220 P. 64, 65, 35 A.L.R. 133 (wife not competent in prosecution of husband for incest with his stepdaughter, under statute permitting such testimony "for a crime committed · one against the other [Comp.Laws 1921, § 2699]," but distinguishing bigamy and other "direct infringements upon the marital rights" of the wife); Jenkins v. State, 1935, 191 Ark. 625, 87 S.W.2d 78, 80 (prosecution for murder of child; statute permitted testimony in cases of an "injury has been

done by either against the person or property of either" [Crawford & Moses' Dig. § 3125]).

In the dissenting opinion in the Woodrow case, supra, it was said at 52 S.E., loc. cit. 550, 551, 2 L.R.A.,N.S., loc. cit. 871, 872: "Any interpretation of the common law which ignores natural rights is not to be entertained, for its object is the vindication of such rights. The general rule to which exception has been made is not predicated upon any natural, inalienable right, but merely upon public policy, and to say that public policy will, in any event, be carried to the extent of destroying a natural right, or falls short of the protection of such rights, is to carry it beyond reason. * * * when the blood of husband, wife, or helpless child is found on the door of the home, and wounds on the body of such member of the family, the law must invade that home and permit the truth to be disclosed, else the enemy of the home and all society, and violator of all laws, human and divine, must go unwhipped of justice. The law of necessity alters the general rule of competency under such circumstances. This is the force and effect of the common-law decisions which permit the husband and wife to testify against each other on charges affecting their persons and liberty. They declare a principle of the common law, and the reason for the application of that principle here is imperious."

In Colorado the statute permitting testimony of one spouse against the other is essentially a declaration of the common law exception, perhaps in somewhat broadened terms; such testimony is permitted where there has been "a crime committed by one against the other." [Laws 1929, p. 642] It has been held there that a wife may testify against the husband when he is charged with the murder of the wife's child. O'Loughlin v. People, 90 Colo. 368, 10 P.2d 543, 82 A.L.R. 622 (with a dissent); see also Wilkinson v. People, 86 Colo. 406, 282 P. 257 (rape by husband of a daughter of the wife by a former marriage); and

Read v. People, 122 Colo. 308, 221 P.2d 1070. In the O'Loughlin case, supra [90 Colo. 368, 10 P.2d 547], the court expressly announced its departure from the doctrine of the early case of Bassett v. United States, 137 U.S. 496, 11 S.Ct. 165, 34 L.Ed. 762, which restricted such testimony to instances of personal violence against the wife, and the court said that " * * * reason and justice demand the broader interpretation * * *;" in a concurring opinion it was stated that "a crime that directly affects an individual is also a crime against such individual." In some states, statutes relating to crimes against the wife have been construed so as to permit her testimony in cases of incest, adultery and bigamy. Many of these cases are collected in the note appearing in 4 A.L.R. at page 1069 et seq.

The common law must continually expand with the progress of social development, in order to meet the exigencies and usages that arise of necessity from the growth and progress of society (Yerger v. Smith, 338 Mo. 140, 89 S.W.2d 66, 74; State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 85 S.W.2d 1026, 1029–1030) except where limited by statute (§ 1.010). In Lutwak v. United States, 344 U.S. 604, loc. cit. 614, 73 S.Ct. 481, loc. cit. 487, 97 L.Ed. 593, the court said: "Under this rule, the competency of witnesses is to be governed by the principles of the common law as they *may be* interpreted by the courts in the light of reason and experience. The governing principles are not necessarily as they had existed at common law. Congress has not acted, and has specifically authorized this Court to prescribe rules of criminal procedure, but the rules do not specifically answer the problem here. Therefore, it is open to us to say whether we shall go further and abrogate this common-law rule disqualifying one spouse from testifying in criminal cases *against* the other spouse."

 Having determined that the common law exception permitting the testimony of the wife in certain cases still

exists in Missouri, we may now determine its present scope, in so far as this case is concerned. We are much inclined to the view stated by Mr. Wigmore (8 Wigmore on Evidence, § 2239, p. 258) that: "By a liberal view *any injury to a spouse's child* is a wrong to the spouse, and his or her testimony becomes admissible against the other." However, we need not go so far here. The offense presently charged was a crime against the person of an infant less than 5 months of age; there is at least a fair inference that no one was present except the defendant, the wife, and the child. We now hold that the wife, testifying voluntarily, is a competent witness against her husband in a prosecution for acts constituting a crime of personal violence against her child. The exact scope of the common law exception has been somewhat nebulous and confused; we need not attempt at this time to define further its precise limits and boundaries. The present offense can well be classed as one against the marital status, within the authorities using that test as a guide. We hold that every reason of public policy and true necessity which permits the wife to so testify in the event of a personal injury to herself, applies equally here. The modern tendency is to relax the old rules of incompetency of witnesses, generally. Funk v. United States, 290 U.S. 371, 54 S. Ct. 212, 78 L.Ed. 369. This tendency is exemplified in many of the modern statutes. It is, in our opinion, contrary to all principles of morality and justice to close the mouth of the only witness in such a case as the present. What is not good sense should not be the law.

To the extent indicated in this opinion, the broad statements in certain cases to the effect that in no event may a wife testify against her husband in a criminal case, or testify without his consent, should no longer be followed. Generally, these statements were not necessary to the respective decisions. See State v. Wooley,

215 Mo. 620, 115 S.W. 417; State v. Willis, 119 Mo. 485, 24 S.W. 1008; State v. Kodat, 158 Mo. 125, 59 S.W. 73, 51 L.R.A. 509. To the same extent, the principle of those Missouri cases limiting the wife's voluntary testimony to those cases where her husband is prosecuted for a crime or personal injury upon or to her own person, is extended as herein indicated.

We do not base this decision upon the fact that Betty Kollenborn had been divorced from the defendant prior to the time of trial. It has been stated that her marital status at the time of trial should control. State v. Dunbar, 360 Mo. 788, 230 S.W.2d 845, 848. The contrary has also been asserted. State v. Kodat, 158 Mo. 125, 59 S.W. 73. There is a conflict on that subject generally. Vol. 3, Wharton's Criminal Evidence, 12th Ed., § 772, pp. 109, 110; 8 Wigmore on Evidence, 3d Ed., § 2237, pp. 247–250. The grounds already discussed are sufficient here.

This being a criminal case, what we have said is not to be taken as controlling in attempted civil litigation between spouses for negligence. The general policy of preserving domestic harmony is applicable in some degree to both classes of cases, but we are dealing here also with the preeminent duty of the courts to enforce the criminal laws, and with the interests of the public generally.

█ The appellant's assignments of insufficient proof of the crime, and of error in failing to direct a verdict, have already been disposed of. The assignment that the verdict should have been for the defendant on the evidence raises nothing under our Rule 27.20, 42 V.A.M.S. Supreme Court Rules. The formal parts of the record are deemed sufficient. The judgment of conviction is hereby affirmed. It is so ordered.

All concur.